IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHERYL C. TAYLOR,

       Plaintiff,

v.

TEXACO, INC., et al.,

       Defendants.

CIVIL ACTION NO.
4:04-CV-212-JEC

## ORDER & OPINION

This case is presently before the Court on Defendants' Motion for Summary Judgment [30]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Defendants' Motion for Summary Judgment [30] should be **GRANTED in part and DENIED in part.**

## BACKGROUND

### I.   Procedural History

Plaintiff Sheryl Taylor filed a Complaint on May 21, 2004, in the Superior Court of Catoosa County, Georgia alleging violations of the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. and Fair Labor Standards Act 29 U.S.C. 203 et seq. ("Compl." [1-1].) Defendants Protiva and MD Maniruzzaman filed a Notice of Removal [1] on July 12, 2001. Defendants Shell and Texaco did not join this motion.

Following a motion by plaintiff to remand the case, the parties mutually agreed to transfer this matter to United States District Court, Northern District of Georgia, Rome Division. ("Consent Order" [9].)[1]

On August 10, 2004, plaintiff filed a Motion for Leave to File an Amended Complaint seeking to add allegations of a violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626 *et seq.* ("Mot. to Amend" [11].)[2]  In her motion, plaintiff stated that a proposed Amended Complaint would be tendered herewith; however, plaintiff failed to file the proposed Amended Complaint with the motion.  Judge Thrash granted plaintiff's motion on February 23, 2005 ("February 23, 2005 Order" [10].)  Despite this Order, the plaintiff never filed an Amended Complaint asserting an Age Discrimination in Employment claim.

On May 5, 2006, defendants filed a Motion for Summary Judgment ("Def.'s Mot. for Summ. J." [30].)  Plaintiff filed her Response to Motion for Summary Judgment ("Opp'n to Def.'s Summ. J." [42]) on June

---

[1]  On August 31, 2004, the case was reassigned from the Honorable Orinda D. Evans to the Honorable Thomas W. Thrash, Jr.  On October 14, 2005, Judge Thrash recused himself and the case was reassigned to the undersigned.

[2]  Plaintiff had filed a charge of age discrimination with the EEOC on May 24, 2004, and noted that she would formally proceed with a charge of age discrimination once she received a right to sue letter. ("EEOC Charge" attach. as Ex. 2 to Taylor Deposition "Taylor Dep." [34].)

AO 72A
(Rev.8/82)

16, 2006, and defendants filed their response to that motion on July 31, 2006 ("Def's Resp. to Pl.'s Opp'n to Summ. J." [57-1].)

On June 1, 2006, after defendants had filed the motion for summary judgment now pending before the Court, plaintiff sought to amend her complaint to add Motiva, Inc. or Motiva Enterprises, LLC ("Motiva"), as a party.  In support of this motion, Taylor relied on and incorporated the Memorandum of Law in Support of Motion to Amend in the related case, *Lejean Koger v. Texaco, et al.*, Civil Action No. 4:04-CV-205-JEC.  On August 24, 2006 Magistrate Judge Johnson issued an Order (*Koger* [67]) denying this motion.  The plaintiff in *Koger,* who is represented by the same counsel as the plaintiff in this case, did not appeal.  This Court adopted Magistrate Judge Walter Johnson's July 18, 2006 *Koger* Order denying plaintiff's Motion to Amend in that case, and denied plaintiff Taylor's identical motion here.  (August 24, 2006 Order [58].)

Defendant's Motion for Summary Judgment [30] is now pending.

## II.    Statement of Facts

Plaintiff Sheryl Taylor began working at a Texaco-brand gasoline station and convenience store at 5511 Alabama Highway in Ringgold, Georgia in 1985 or 1986.  (Taylor Dep. [34] at 15 l. 18-22.)  At some point during plaintiff's tenure, Texaco merged with Shell and the 5511 Alabama Highway station became a Shell-brand station.  (Taylor

3

Dep. at 17:8-10.)  Accordingly, the Court will hereinafter refer to defendants Texaco and Shell as Shell.

Although the pleadings are not entirely clear about the following sequence of events, it appears that in November 2003, Shell divested itself of the day-to-day operations of this Ringgold station and other Shell stations in the area by entering into a contractual relationship with another company, defendant Protiva, Inc., to handle the daily operations of both the gas station and convenience store. Shell utilized a limited liability company that it had created, Motiva Enterprises, LLC, to enter into these contractual arrangements.  Motiva is a refining and marketing joint venture between Shell and affiliates of an entity called Saudi Aramco. (Defs. Statement of Material Facts "DSMF" [30] at ¶ 2).  Motiva's marketing operations support a network of Shell and Texaco brand gasoline stations in the Eastern and Southern United States.  *Id.*

In November 2003, Motiva and defendant Protiva entered into two agreements that governed the relationship between Motiva (Shell) and Protiva as to the Ringgold station and 19 other stores: the "Multi-Site Contractor Operator Retail Outlet" ("CORO Agreement" [32]) and the "Multi-Site Non-Petroleum Facility Lease" ("Lease" [33].) (Collectively "the Agreements").  (DSMF at ¶ 1,3).

At the time that Protiva took over these twenty Shell stores, all employees were terminated as Shell employees.  (Aff. of Henry R.

4

Miller [31].)  Most of these employees, like plaintiff Taylor, were nevertheless retained by Protiva as Protiva employees. *Id.*  Plaintiff had previously been a manager of the store for eleven years, but had stepped down from that position in 1999 because she did not want the added stress and responsibility.  (Taylor Dep. at 17; DSMF at ¶ 11; Pl.'s Statement of Material Facts "PSMF" [47] at ¶ 11.)  At the time of her termination, she was a cashier who typically worked 32-40 hours a week. (Taylor Dep. at 40-41; DSMF at 13; PSMF at 13.)

The events leading up to plaintiff's termination are as follows. On April 11, 2004, Easter Sunday, plaintiff woke up with a sinus infection.  She called Lejean Koger, the assistant station manager, and told her that she was too ill to come to work.  (Taylor Dep. at 52; DSMF at 14; PSMF at 14.)  Plaintiff sought medical attention that day, but both of the facilities she visited were closed for Easter. (Taylor Dep. at 52; DSMF at ¶ 15; PSMF at ¶ 15.)  The next morning, Monday, plaintiff visited a doctor who diagnosed her as having a sinus infection.  (Taylor Dep. at 53; DSMF at ¶ 16; PSMF at ¶ 16.) The doctor provided Taylor with a prescription and a certificate to return to work the following day.  (Taylor Dep. at 53; "Certificate to Return to Work or School" attach as Ex. 1 to Taylor Dep; DSMF at ¶ 17.)

On that next day, which was Tuesday, plaintiff notified her manager, Moni Mannaruzziman, that, although she still did not feel

5

well, she would return to work.  (Taylor Dep. at 53; DSMF at ¶ 18; PSMF at ¶ 18.) Maniruzziman said that he would check the schedule and get back to her.  He never did. (PSMF at ¶ 68;69) Instead, after plaintiff  had called back on several occasions about working, Mannaruzziman told the assistant manager, LeJean Koger, to fire the plaintiff; Koger refused but told plaintiff about the request. (PSMF at ¶ 75, 76.) Plaintiff then called Mannaruzziman and inquired whether she still had a job.  *Id.* at ¶ 78.  He said that she did not because of a cash shortage that the plaintiff had purportedly had a month before.  *Id.* at ¶ 79.  Plaintiff had not had a cash shortage, however; instead, the incident to which Mannaruzziman apparently referred was actually a mistaken double charge of a customer.  *Id.* at ¶ 80.  Prior to this conversation, Mannaruzziman had never discussed the double-charge with plaintiff nor documented the incident as worthy of any disciplinary action.  *Id.* at ¶ 81, 87.

Thereafter, the plaintiff contacted Babul Islam, Protiva's Key Management person, who said that she should not have been fired and indicated that he would allow plaintiff to return to her job if she would not insist on being compensated for her lost shifts and if she would accept a cut in pay.  *Id.* at ¶ 89.   Plaintiff declined this offer.  She has now sued the defendants for terminating her in violation of the Family Medical Leave Act.

6

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion.  *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990).  The movant is not required to negate his opponent's claim, however.  The movant may discharge his burden by merely "'showing'--that is, pointing out to the

7

district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[3] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith*

---

[3] The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

*Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).   An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative."  *Anderson,* 477 U.S. at 249-50.   Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

**II.   Shell's Potential Liability as an Employer**

Plaintiff contends that defendant Shell, along with defendant Protiva, was her employer. As such, plaintiff contends that Shell is liable to her for any violation of the FMLA, or other federal employment statutes,[4] committed by Protiva.  Plaintiff has advanced two theories in support of her contention that Shell should be considered to be her employer, and thus liable for any violation of the FMLA committed by Protiva: (1) joint venture theory and (2) joint employer theory.

**A.   Joint Venture Theory**

Although both parties expend a considerable amount of time discussing whether the relationship between Shell and Protiva is that of a "joint venture," such an analysis does not form the basis of the

---

[4]   Plaintiff also contends that she has asserted a discrimination claim under the Age Discrimination in Employment Act (ADEA).   As discussed *infra*, plaintiff never filed an amended complaint asserting an age discrimination claim.

9

relevant inquiry. Rather, in a related case, *Koger v. Texaco*, 1:04-CV-205-JEC (N.D. Ga. 2006), Magistrate Judge Johnson issued an R&R noting that liability under Title VII turns on whether an entity is considered an employer, not on whether an entity is a "joint venturer." ("Johnson Final Report and Recommendation" [72].) Likewise, liability under the FMLA is found only when an entity may be considered the plaintiff's employer.[5] Thus, that an entity may be involved in a joint venture with an employer does not, by itself, make that joint venturer also an employer.

Further, plaintiff has failed to persuade the Court that Shell[6] and Protiva were engaged in a joint venture. A joint venture arises when two or more parties combine their property, labor, or both, in a joint undertaking for profit. However, in order for a joint venture to exist, "there must be not only a joint interest in the

---

[5] The FMLA does define the term "employer" more expansively than do the other employment statutes, as the FMLA notes than an employer can also be "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." *Wascura v. Carver*, 169 F.3d 683, 685 (11th Cir. 1999). The expanded definition of employer found in the FMLA means that the store manager who terminated plaintiff, Moni Mannaruzziman, can also be sued for terminating plaintiff in violation of the FLMA.

[6] Plaintiff has created a problem for herself by failing to name Motiva as a defendant. Motiva, which is clearly affiliated with and acting on behalf of Shell and another joint venturer, Saudi Aramco, was the actual entity with which Protiva contracted. Nevertheless, for purposes of the discussion of joint ventures and joint employment, the Court has assumed that Shell and Motiva are synonymous.

10

AO 72A
(Rev.8/82)

purpose of the enterprise . . . but also an equal right, express or implied, to direct and control the conduct of one another in the activity causing the injury..." *Cullen v. Timm*, 184 Ga. App. 80, 82 (Ga. App. 1987); *See also Rossi v. Oxley*, 269 Ga. 82, 83 (Ga. 1998) (no joint venture, as a matter of law, where physicians agreed to be "on call" for one another, but there was no evidence that the physicians controlled each other's professional judgment in the treatment of patients). The element of mutual control is a crucial element of a joint venture. *Williams v. Chick-fil-A, Inc.*, 274 Ga. App. 169, 170 (Ga. App. 2005).

Evidence of mutual control is missing from this record. That is, Protiva lacked control over Shell, as the latter could terminate part of their arrangement at will. Shell lacked the ability to actually hire any employees--that was within Protiva's sole power--and it also appears that Shell lacked the ability to prevent Protiva from, itself, terminating a particular employee. Finally, although arising in the course of a personal injury suit brought by a third party, the Georgia Court of Appeals has concluded, as to a contractual arrangement somewhat similar to the one at issue here, that no joint venture existed between an entity that sold BP's gas and BP, merely because BP dictated the station's appearance and cleanliness and BP sent personnel on occasional visits to ensure conformity with these standards. The court concluded that such an

11

arrangement lacked the mutual control necessary for a joint venture. *See BP Exploration & Oil, Inc. v. BP Exploration & Oil, Inc.*, 252 Ga. App. 824, 828 (2002).[7]

**B.   Liability as a Joint Employer**

Plaintiff's primary argument is that Shell and Protiva were her joint employers and hence Shell is liable for Protiva's alleged violation of the FMLA. On this point, the plaintiff has a stronger argument. Indeed, the defendants have failed to even attempt a response to plaintiff's contention that both Shell and Protiva were joint employers, as their reply to plaintiff's response continues to focus only on caselaw related to the joint venture theory.

In making her argument, plaintiff has cited to *Virgo v. Riviera Beach Assoc., Ltd.,* 30 F.3d 1350, 1359-1360 (11th Cir. 1994) and to CFR regulations governing joint employment questions in FMLA matters. *Virgo,* which examined an alleged joint employment relationship in the FMLA context, adopted a test promulgated by the Third Circuit: that is, whether one employer, while contracting with another employer,

_____

[7]     Plaintiff also argues that Shell, Texaco and/or Motiva admitted that they employed a co-employee of Lejean Koger (plaintiff's co-employee, who has asserted a Title VII and 1981 claim against Shell, *et al.*) in a case filed by Constance Trapich. Specifically, in the Answer to plaintiff's complaint, Shell and Motiva purportedly admitted being the employer of Trapich. *See Trapich v. Starstaff, Inc., et al.*, Civ. A. No. 4:04-CV-019 (N.D. Ga.) (Answer [3] at 7.)   The events in the *Trapich* case, however, occurred prior to the time when Protiva took over the daily operations of the convenience store.

AO 72A
(Rev.8/82)

has "retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. " (*Id.* at 1360, quoting *NLRB v. Browning-Ferris Industries,* 691 F.2d 1117, 1123 (3d Cir. 1982).)   The Eleventh Circuit noted that whether a purported joint employer retained sufficient control is essentially a factual question.   *Id.*

29 C.F.R. § 825.106(a) notes that a joint employment relationship may exist where "an employee performs work which simultaneously benefits two or more employers...."  Further, such a relationship will generally be considered to exist "(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer." *Id.*  Further, a determination of a joint employment relationship is not determined by any single criterion, but instead "the entire relationship is to be viewed in its totality."  § 825.106(b).

Applying these very general standards to the arrangement at issue here, plaintiff argues, requires a conclusion that Shell should be deemed a joint employer. Specifically, plaintiff notes that Shell has the power to dictate general requirements of employees, regarding dress, English language ability, the non-use of drugs, scripted responses to customers' questions about gasoline, and the like; Shell

13

also has reserved for itself the right to send in inspectors to evaluate the operation of the store, as well as "mystery shoppers" who can evaluate the performance of the employees. Most importantly, plaintiff notes that while the Lease and CORA agreement give the Operator (Protiva) the right to hire and discharge employees, the Company (Shell) has the right to insist, upon a showing of cause, that Protiva promptly fire a specified employee.

Examining the above facts, it is clear that Protiva has the power to exert the greatest control over its employees, as it has sole hiring authority and is envisioned as the entity that will generally be deciding whether to terminate an employee. Further, Protiva handles the day-to-day supervision of its employees. Nevertheless, it is clear that Shell maintains the right to insist that certain standards be adhered to by the employee. Further, Shell has the right to insist, upon good cause, that Protiva promptly fire a specified employee, even if Protiva does not wish to do so. Thus, Shell has some control over the employees. At the least, then, plaintiff has made a colorable argument that Shell is a joint employer.

Given the existence of a potentially meritorious argument by plaintiff, one would have expected defendant Shell to try to rebut that argument in its own Reply. Instead, Shell completely ignored plaintiff's arguments concerning the joint employment relationship

14

and merely repeated its earlier arguments about the absence of a
joint venture.  The Court does not know whether it would conclude
that Shell is a joint employer, had the issue been fully briefed by
the defendant.  Yet, Shell did not rebut, or even attempt to rebut,
plaintiff's argument that Shell was a joint employer, and Shell cited
no case authority on the issue.  It is not up to this Court to do the
laborious research and analysis that would be required to articulate
a persuasive counter argument.   As Shell chose not to engage
plaintiff in this particular skirmish, the Court will not fight this
battle on Shell's behalf.

Accordingly, the Court deems that Shell has not objected to
plaintiff's contention that Shell is a joint employer and  the Court
therefore will **DENY** defendant Shell and Texaco's motion for summary
judgment as to defendants' status as joint employers.

### III. Merits of Plaintiff's FMLA Claim

#### A.    Background

The FMLA grants an eligible employee the right to take up to 12
workweeks of unpaid leave annually for health conditions that meet
the requirements set out by the statute.  An employee who contends
that an employer has not complied with the above requirements may
bring an action that raises one of two types of claims:  an
interference claim in which the employee asserts that her employer
denied or interfered with the substantive rights under the Act or (2)

15

a retaliation claim, in which the employee asserts that the employer discriminated against her because she engaged in activity protected by the Act.  *Hurlbert v. St. Mary's Health Care System, Inc.,* 439 F.3d 1286, 1293 (11th Cir. 2006).

Although the plaintiff is not terribly precise in distinguishing between the two types of claims, the facts of her dismissal appear to give rise to a retaliation claim.  That is, she asserts that she took leave that was permissible under the FMLA when she missed one-two days of work because she was ill with a sinus infection.  She further asserts that her employer retaliated against her for taking this leave by firing her immediately after she had taken time off.

There are several hurdles that a plaintiff must clear before she can state a valid FMLA claim.  The Court explains its reasoning as to why plaintiff has failed to meet several of these elements, as follows.

## B.  **"Eligible Employee" Status-Requirement of 50 or more Employees**

An employee is eligible to take advantage of the protections of the FMLA only if her employer employs at least 50 employees at the worksite where the employee works, or unless the employer also employs at least 50 employees within 75 miles of the employee's worksite. 29 U.S.C. § 2611(2)(B)(ii).  This provision is known as the "worksite" requirement.

16

Plaintiff offers several theories as to why she satisfies this worksite requirement. First, plaintiff contends that Protiva, alone, employed more than 50 employees within 75 miles of the Ringgold store.   To support that assertion, plaintiff has provided a chart that she assembled based on the testimony of Protiva manager, Babel Islam, concerning the number of employees at each of Protiva's stores.   (PSMF [47] at ¶ 71.)   Plaintiff then uses a web-based map program to calculate the distance each of these other stores was from the Ringgold store.   Ten of the twenty stores operated by Protiva were more than 75 miles from the Ringgold store.   Although the plaintiff did not total up the number of employees at qualifying stores on her chart, she indicates that adding to this unspecified number the two additional employees who worked at home meant that Protiva employed 52 people within 75 miles of the Ringgold store. *Id.* at 72-74.

The Court wishes that plaintiff had explained her arithmetic because the Court has added up the number of employees at stores within 75 miles on the chart and comes up with only 44 employees; adding the other two employees just gets one to the number 46. Accordingly, the Court concludes that plaintiff cannot get to the magic number of 50 employees by looking at the number of Protiva employees.

17

AO 72A
(Rev.8/82)

Plaintiff has also offered alternative theories to support her head count of more than 50 employees. First, she argues that Shell is a joint employer and that accordingly one must add in the numerous Shell employees who happen by the Ringgold store, such as Shell inspectors, managers, gasoline deliverers, mystery shoppers, and the like. If one does this arithmetic, she argues, the number greatly exceeds 50. (Pl.'s Resp. [42] at 18.)

The Court has denied defendant Shell's motion for summary judgment on the joint employer theory, but that ruling is a fragile determination that the Court suspects might well be disturbed should Shell decide to get its legal act into gear at a trial and better demonstrate that it is not a joint employer. Further, plaintiff is merely speculating that there would be well over 50 employees if one added in Shell employees who visit the Ringgold site. She has not actually provided the names or numbers of these Shell employees.[8] Hence, utilizing the Shell employees to arrive at a final tally appears a bit speculative.

Finally, plaintiff argues that Protiva is a successor in interest to Shell and therefore, to meet the statutory minimum number of 50 employees, plaintiff can rely on the number of employees who

---

[8] The Court also does not know whether such individuals, who do not regularly work at the Ringgold site, but instead who merely service or supervise it on an intermittent basis, would count as Ringgold employees. Perhaps, they would count as employees within a 75 mile radius. Neither party has briefed this issue.

18

AO 72A
(Rev.8/82)

were employed by Shell prior to the transfer of interests to Protiva. To be sure, 29 U.S.C § 2611(4)(A)(ii)(II), does indicate that a successor in interest to an employer can be deemed an employer. Examining the factors set out by C.F.R. § 825.107, the Court will assume that Protiva is a successor in interest to Shell.   That inference does not, however, necessarily mean that Protiva can be deemed to employ 50 people within 75 miles, just because Shell once did.   Moreover, as noted *supra*, plaintiff has not provided evidence to establish that Shell, itself, ever employed 50 or more employees at worksites within 75 miles of the Ringgold store.   Thus, the record does not establish that an individual employed by Shell, at the time the latter ran the store, would have been deemed an eligible employee under the workplace rule of the FMLA.

In short, the Court concludes that plaintiff has failed to offer evidence that would demonstrate the existence of 50 or more employees within 75 miles of the Ringgold workplace.    Accordingly, this deficiency, alone, is sufficient to warrant the **GRANTING** of summary judgment on plaintiff's FMLA claim.

### C.    "Eligible Employee": Duration of Employment

The FMLA also provides that one is an eligible employee only if one has been employed for at least 12 months by the employer <u>and</u> for at least 1,250 hours of service with such employer during that 12 month period of time.   29 U.S.C. § 2611 (2)(A).   Defendants have

19

argued that plaintiff met neither prong of this requirement. (Defs. Mot. for Summ. J. [30] at 10.) As to the former, defendants note that plaintiff became employed by Protiva on November 17, 2003, when the latter assumed operations, and she was terminated around Easter 2004. Hence, plaintiff worked less than a year for Protiva. Defendants also contend that plaintiff has failed to offer any evidence that she worked for 1250 hours in the preceding year's period. *Id.*

Plaintiff has responded that she worked for Protiva's predecessor, Shell, for almost 20 years before Protiva took over. (Pl.'s Resp. [42] at 20). On this particular point, the Court concludes that Protiva's status as a successor in interest would allow the plaintiff to meet the requirement of having worked at least 12 months for the employer prior to the leave in question.

Unfortunately, however, plaintiff has not attempted to rebut the defendants' assertion that plaintiff has failed to demonstrate that she satisfied the 1250 hour work requirement. Indeed, the Court has searched through the plaintiff's response memorandum and has discerned no response to the defendants' contention nor any citation to any evidence that plaintiff might have offered on this point. Accordingly, as plaintiff has offered no evidence to support this essential part of the "eligible employee" requirement, the Court

20

concludes summary judgment must be **GRANTED** to defendants on this element.

### D.    Requirement that Plaintiff Suffer from a Serious Health Condition

#### 1.    Statutory and Regulatory Provisions

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period ··· [b]ecause of a *serious health condition* that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).    The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves-(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11).

Obviously, plaintiff did not receive inpatient care at a hospital because of the sinus infection that she suffered on Easter 2004.    Accordingly, she can assert a viable FMLA claim only if she can demonstrate that she had an illness, injury, or physical condition that involved "continuing treatment by a health care provider."    The FMLA does not define "continuing treatment by a health care provider," but the Department of Labor has issued a regulation explaining that phrase and offering five means by which an employee can satisfy the requirement of "continuing treatment by a

21

health care provider."   Only two of those provisions are potentially

applicable in this case:

> (2)  *Continuing Treatment* by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>
>> **(i) *A period of incapacity*** ( *i.e.,* inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) **of more than three consecutive calendar days,** and any subsequent treatment or period of incapacity relating to the same condition, **that also involves:**
>>
>>> (A)  **Treatment two or more times by a health care provider,** by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services ( *e.g.,* physical therapist) under orders of, or on referral by, a health care provider; **or**
>>>
>>> (B)  **Treatment by a health care provider on at least one occasion** which results in **a regimen of continuing treatment under the supervision of the health care provider.**
>>
>> **OR**
>>
>> **(iii) *Any period of incapacity or treatment for such incapacity...due to a chronic serious health condition*.**  A chronic serious health condition is one which:
>>
>>> (A) **Requires periodic visits for treatment** by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

AO 72A
(Rev.8/82)

(B) **Continues over an extended period of time** (including recurring episodes of a single underlying condition)**; and**

(C) **May cause episodic** rather than a continuing period of **incapacity** (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.114(a)(2)(i)(A)-B) <u>and</u> (iii)(A)-(C)(emphasis added).

## 2.   Period of Incapacity

To satisfy the "period of incapacity" provision, the plaintiff must have been unable to work for <u>"more than three consecutive calendar days</u>" and she must have either been <u>treated two or more times</u> for this condition <u>or</u> treated on only <u>one occasion if</u> that one treatment was <u>followed by a regimen of continuing treatment</u> under the supervision of the health care provider.

The Eleventh Circuit has interpreted § 825.114 as requiring three full days of incapacity. *Russell v. North Broward Hosp.*, 346 F.3d 1335, 1343-1344 (11th Cir. 2003). Plaintiff founders on this requirement, as she was not unable to work for more than three consecutive days. To recap, plaintiff woke up Easter morning with a "severe sinus infection." (Affidavit of Sheryl Taylor [46] at ¶ 1) She then called her employer and said that she was "too sick to come to work." (*Id.* at ¶ 2) Plaintiff was unable to find medical help on Easter day, so she went back to bed, and on Monday morning, went to see a doctor (*Id.* at ¶ 3-4)

23

According to plaintiff, the doctor told her that she had a severe sinus infection and that she should stay home from work an additional two or three days. *Id.* at ¶ 4. Plaintiff knew that her employers were very strict about absences and had terminated people for that reason. As a result, she was afraid to miss more than two days. *Id.* at ¶ 6. Plaintiff told the doctor that she needed the money and could not risk losing her job by staying off more than one day. *Id.* at ¶ 5. Thereafter, the doctor gave her a work release for one day. *(Id.* at ¶ 9 and "Certificate to Return to Work or School" attach. as Ex. 1 to Taylor Dep.)

The defendants had posted no information about the FMLA nor ever offered leave under that statute, and plaintiff had no idea that she had a right to take time off work for serious health conditions under the FMLA. *Id.* at ¶ 7-8). Had she known, she would have stayed off for the time period recommended by the doctor. *Id.*

On this evidence, the Court concludes that plaintiff has failed to show a three day period of incapacity. Her doctor signed a release showing only a one day period of incapacity and plaintiff telephoned her employer indicating that she was prepared to come back to work on Tuesday, which would have meant that she had suffered from a two-day period of incapacity. The Court is sympathetic to plaintiff's explanation that she felt that she could not miss work because the defendants had a strict absence policy and had never

24

informed any of their employees about the FMLA.  Indeed, the Protiva

defendants have admitted that they were unaware even of the existence

of the FMLA and had a rule disallowing more than two excused

absences.  Accordingly, the Court will assume that the existence of

the release letter attesting to two days of incapacity is not

dispositive if plaintiff could in fact show that she was actually

incapacitated for three or more days.  Yet, plaintiff has only

offered what her doctor told her about her condition, which is

hearsay.  To offer admissible evidence of her actual condition, she

would have needed to offer the testimony of her doctor.

Therefore, the Court concludes that plaintiff cannot demonstrate

a "period of incapacity" under the FMLA.  She can, however, survive

the "Continuing Treatment" prong of the statute if she can show that

she had a "chronic serious health condition."  To demonstrate the

latter, she must show the existence of a condition that required

periodic visits for treatment by a health care provider, that

continued over an extended period of time, and that was episodic.

Plaintiff argues that she suffered from a chronic serious

medical condition, but she has not pointed the Court to any evidence

supporting such a contention.  As with much of this case, the Court

has had to perform much of the research and analysis for both parties

that their counsel should have offered.  Accordingly, the Court took

25

it upon itself to review plaintiff's deposition transcript and found the following exchange:

> Q: How often did you see the doctor for the sinus infection prior to this?
> A: I usually would have a flare up at least once or twice a year, usually in the spring and in the fall.
>
> Q: Would you take over-the-counter medication generally?
> A: Yes.
>
> Q: Did you normally have to go seek medical care from the sinus flare-ups before this?
> A: No.
>
> Q: In other words, do you have like an elaborate medical history for sinus problems where you can provide me medical documentation prior to this time?
> A: No.
>
> Q: Because I know that we have the note here. In other words, when was the last time before this you had ever gone and seen a doctor for sinus problems?
> A: I couldn't tell you.
>
> Q: You said you would flare up once (sic) to two times a year, but my understanding is that you would take over-the-counter and try to deal with it normally? Is that a yes?
> A: Yes.
>
> Q: You never saw an allergist in other words?
> A: No.
>
> Q: You didn't see your primary doctor that one or two times a year, is that correct?
> A: I go to the doctor once a year.

(Taylor Dep. [34] at 54-55.)

Following the filing of defendants' motion for summary judgment, the plaintiff filed an affidavit on June 14, 2006 that further

26

addressed this point.  In the affidavit, plaintiff notes that she had "suffered from sinus problems for the last three or four years, at least twice a year."  Due to those continuing sinus problems, plaintiff indicates that she currently has an agreement with her doctor to obtain prescriptions for her sinus infections anytime that they flare up, without even having an appointment.  Plaintiff further states that she keeps this medication on hand because her sinus problems can begin at any time without notice.  (Affidavit of Taylor [47] at ¶ ¶ 16-17).

It is plaintiff's burden to demonstrate (1) that she had periodic visits for treatment by a health care provider for her sinus condition, (2) that her sinus condition continued over an extended period of time, and (3) that it was episodic.  Her deposition testimony constitutes evidence of the latter two of these requirements.  The testimony does not, however, demonstrate that plaintiff had periodic visits with a health care provider for treatment of this sinus condition.

The defendants have not asked that her Affidavit be struck and the Court has read that document.  This Affidavit, provided in 2006, indicates that plaintiff currently has an agreement with her doctor to obtain prescriptions for her sinus infections anytime that they flare up, without having to see the doctor.  The affidavit does not indicate what relationship she had with a doctor at the time of her

27

sinus infection in 2004.   More importantly, the affidavit does not indicate that plaintiff has periodic visits with a health care provider for treatment of her sinus condition.   Accordingly, the Court concludes that plaintiff has failed to offer evidence sufficient to establish the "continuing treatment prong" of the FMLA, and hence summary judgment should be **GRANTED** to the defendants on this element of the statute.

### E.   Retaliation for Protected Activity Under the FMLA

Were plaintiff able to demonstrate the above-discussed elements of an FMLA claim--to demonstrate that she was an eligible employee and that she had a serious health condition--she would still be required to offer evidence that her employers retaliated against her because of protected activity under the FMLA.   29 U.S.C. § 2615(a)(1)-(2);   *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).   To establish a retaliation claim under the FMLA through circumstantial evidence, a plaintiff must utilize the *McDonnell Douglas* burden shifting analysis.[9]   In the context of an FMLA claim, plaintiff must demonstrate (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment decision; (3) a causal connection between the adverse employment decision and protected

---

[9]   Plaintiff does not attempt to establish her retaliation claim through direct or statistical evidence.

28

activity; and (4) that she was qualified for the position at the time of the adverse employment decision. *Kaylor v. Fannin Reg'l Hosp. Inc.*, 946 F. Supp. 988, 1001 (N.D. Ga. 1996) (internal citation omitted).

As noted, plaintiff has failed to demonstrate that she availed herself of a protected right under the FMLA because she failed to demonstrate that she was an eligible employee under the Act or that she suffered from a serious health condition when she requested leave. Had she met these two prongs of the test, however, the Court would conclude that she had otherwise created a triable issue on retaliation. That is, plaintiff was fired from a job from which she was obviously qualified. Plaintiff has also produced evidence to show a causal connection between the leave and her termination, as she was fired almost immediately after this very short leave. Firing a 20-year employee who has taken off one day's leave for sickness, by itself, raises suspicion. Although the defendants have offered a purportedly non-discriminatory reason for plaintiff's termination-- that she had a cash shortage on one occasion a month before--the plaintiff has offered sufficient evidence that would allow one to infer that this reason was pretextual. That is, plaintiff did not have a cash shortage nor could the manager have thought that she did; instead, she had double-charged a customer a month before. Moreover, although the incident had occurred over a month before, the manager

AO 72A
(Rev.8/82)

had never mentioned it to the plaintiff.  Finally, Babul Islam,

Protiva's Key Management person and the manager's boss, later told

plaintiff that she should not have been fired, but Islam would allow

the plaintiff to return to work only if she would not insist on being

compensated for the shifts that she lost as a result of the

unjustified termination.[10]

In short, had the plaintiff been able to demonstrate that she

was entitled to FMLA protection for the leave in question, this Court

would conclude that she would be entitled to proceed on her FMLA

retaliation claim.[11]

---

[10]  Islam also conditioned plaintiff's return to work on her
agreement to accept a cut in pay. Requiring the plaintiff to forgive
a loss of income that has resulted from an adverse employment action
in violation of the FMLA is obviously not a condition that an
employer who has violated the FMLA can demand.  Asking the plaintiff
to accept a cut in pay going forward is, however, a condition that an
employer can generally put on any employee at any time, absent a
contract or collective bargaining agreement to the contrary.  Whether
or not this second condition could conceivably constitute retaliation
under the FMLA would depend on other facts not evident in this
record.

[11]  Defendants have also argued that the plaintiff is not
entitled to make a FMLA claim because she did not adequately notify
her manager that her leave was covered by the FMLA. It is true that
an employee cannot merely demand leave, but must provide the employer
with some reason to believe she is entitled to protection under the
FMLA.  *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1385 (11th
Cir. 2005) (informing an employer that one wishes to take leave to
help one's daughter with her pregnancy, which, by itself, is not a
serious medical condition, was not sufficient to put the employer on
notice of the need for FMLA leave, even though the daughter was
actually suffering from pregnancy complications that would constitute
such a condition); *Aubuchon v. Knauf Fiberglass GmbH*, 359 F. 3d 950,
952 (7th Cir. 2004) ("[i]f you have brain cancer but just tell your

30

## IV.   Age Discrimination

On January 28, 2005, plaintiff filed a Motion for Leave to File an Amended Complaint to assert a claim under the Age Discrimination in Employment Act 29 U.S.C. § 626 *et seq.* ("First Mot. to Amend Compl." at 1-2 [11].)   Though the Court granted this Motion on February 25, 2005 ("February 15, 2005 Order" [12], plaintiff failed to file an Amended Complaint then and has never done so since.   Thus, this case does not contain a claim of age discrimination.   Obviously, at this stage of the litigation, after a summary judgment motion has been fully briefed and is awaiting disposition by the Court, plaintiff's effort to add this new claim is too late.[12]

Further, any age discrimination claim is clearly not supported by this record and summary judgment would be warranted.   Without

---

employer that you have a headache, you have not given the notice that the [FMLA] requires."

In this case, however, it takes a great deal of nerve for the defendants to make this argument.   That is, the plaintiff did not notify the defendants of facts sufficient to put them on notice that the FMLA could cover her requested leave because the defendants had never informed the plaintiff, or any employees, of the latter's potential rights under the FMLA.   Indeed, the defendants had never heard of the FMLA until this litigation.   29 C.F.R. § 825.300 provides that an employer who fails to post the required FMLA notice for its employees cannot thereafter take any adverse action against the employee for the latter's failure to provide notice of a need for FMLA need.

[12]   In their Motion for Summary Judgment, Defendants noted that plaintiff had never made a formal claim of age discrimination in this litigation and could not now pursue such a claim.   Plaintiff never responded to this argument in her own responsive memorandum.

AO 72A
(Rev.8/82)

going through a tedious recitation of the *McDonnell Douglas* test, suffice it to say that a plaintiff who has been fired cannot prove age discrimination unless she demonstrates that her employer replaced her with a younger individual.   Here, plaintiff has offered no evidence concerning her replacement and therefore has necessarily failed to show that the defendants replaced her with a younger individual.   That critical omission would end any age claim, even had the plaintiff asserted such a claim in an Amended Complaint, which she did not do.   *See Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005) (under *McDonnell Douglas* a plaintiff must identify an individual who replaced her or who was treated better in order to establish a prima facie case); *Pierri v. Cingular Wireless, LLC,* 397 F. Supp. 2d 1364, 1372 (N.D. Ga. 2005) (mere conclusory allegations of discrimination or harassment are not enough to withstand a motion for summary judgment (citing *Carter v. City of Miami,* 870 F.2d 578, 585 (11th Cir. 1989).)

Accordingly, the Court **GRANTS** defendants' Motion for Summary Judgment as to any implied age discrimination claim by plaintiff.

**V.      Plaintiff Cannot Establish an FLSA Claim**

Although plaintiff's Complaint alleges, in a conclusory fashion, that defendants violated the FLSA (Compl. at 11), her subsequent submissions indicate that she has abandoned this claim.   Defendants contend that plaintiff did not work over forty hours per week during

32

AO 72A
(Rev.8/82)

her tenure, which is apparently a requirement for an FLSA claim. (Def.'s Mot. for Summ. J. 30-2] at 22; Taylor Dep. [34] at 40-41.) Plaintiff does not refute this evidence.  Thus, the Court **GRANTS** defendants' motion for summary judgment on as to plaintiff's FLSA claim.

## CONCLUSION

The record in this case indicates that the plaintiff, an almost 20-year employee at the Ringgold Station, was treated very shabbily by her employer after she took off one day for a sinus infection. She can recover damages under the Family Medical Leave Act, however, only if she can fulfill all of its elements.  As she has not done so, the Court is required to **GRANT** defendants' Motion for Summary Judgment [30] as to the merits of plaintiffs' claims as to all defendants.  The Court, however, **DENIES** defendants Shell and Texaco's Motion for Summary Judgment as to their status as an employer, and thus as appropriate defendants in the case.

SO ORDERED, this _28_ day of March, 2007.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

33

AO 72A
(Rev.8/82)